**Earl JACKSON, Plaintiff,**

v.

**WARNER BROS., INC., Defendant.**

No. 96–CV–72976.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 29, 1997.

**586**

Constance Y. Ross, Michigan Department of Attorney General, Health Care Fraud Division, Lansing, MI, for Earl Jackson, plaintiff.

J. Michael Huget, Butzel Long, Ann Arbor, MI, for Warner Brothers, Incorporated, a division of Time–Warner Entertainment Company LP, a Delaware Limited Partnership, defendant.

### MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

### I. FACTS

Plaintiff Earl Jackson is an African–American artist whose works include two copy-righted paintings entitled "Following the Path" and "A Place of Crossing." Each painting depicts "rites of passage" of young Africans and traditional African ceremonies celebrating a youth's entrance into manhood and womanhood.[1] Plaintiff distributes his copyrighted art works throughout the country and particularly to Samuel Frederick, proprietor of Samuel's Art Gallery in Oakland County. Defendant Warner Bros. allegedly purchased "A Place of Crossing" and "Following the Path," two lithographs of Plaintiff's original works for use in a feature film entitled, *Made In America.* (See Def.'s Ex. D.)

In 1993, Warner Bros. released *Made In America,* a romantic comedy starring actors, Whoopi Goldberg and Ted Danson. Whoopi Goldberg portrays Sarah, a single mother and owner of "African Queen," a bookstore that sells African–American books and other cultural items. Her home is appropriately decorated with African art. During two scenes in the movie, Plaintiff's paintings are displayed in Sarah's living room and can be seen in the background.

*Made In America* tells the a story of a teenage girl, Zora, raised by her single mother, Sarah, who wants to discover the identity of her biological father. After a discussion with her mother, she learns that her mother went to a sperm bank in order to conceive her. Zora is surprised to find out that Hal Jackson, the name she found in the sperm bank's records, is that of a Caucasian car salesman. Initially, the discovery makes for a tense relationship between Sarah, Zora, and Hal. Later, Hal and Sarah fall in love and are content with the newly formed father-daughter relationship.

During a scene in Sarah's living room while Zora is away, Sarah and Hal kiss passionately and nearly knock Plaintiff's painting, "Following the Path" off the wall. The scene is suddenly interrupted after Zora returns home. The painting remains uneven

---

**1.** Plaintiff's works are inspired by his travels to Africa and his study of African ancestry and traditions.

on the wall. When Zora confronts Sarah about the romantic interlude between Sarah and Hal, the painting is again shown in the background. Plaintiff's paintings, if all of the camera shots are taken together, are not shown for more than 60 seconds. "Following the Path" is shown and is bumped by Goldberg and Danson. According to Plaintiff, "A Place of Crossing" can also be seen in the background.[2]

Plaintiff instituted this action against Defendant alleging that Defendant's use of his works in the film, *Made in America*, is a copyright infringement in violation of the Copyright Act, 17 U.S.C. § 107. Defendant never contracted with Plaintiff to obtain permission to use his art in its film and Plaintiff maintains that he would not have granted permission for Defendant's use even if he had been asked prior to the film's making. Plaintiff considers the movie "culturally exploitive."

Defendant argues that Plaintiff's art was only used as a prop and that the display of the art in the movie does not violate the Copyright Act. Defendant contends that the use constitutes a fair use, a defense from liability under the Copyright Act. Defendant brought this Motion for Summary Judgment alleging that there are no genuine issues of material fact for trial and that it is entitled to the fair use defense under the Copyright Act.

## II. *SUMMARY JUDGMENT MOTION*

### A. Standard of Review.

When ruling on a Rule 56 motion, this Court must determine whether there are issues of fact requiring a trial. In determining whether there are issues of fact requiring a trial "the inferences to be drawn from the underlying acts contained in the [affidavits, attached exhibits and depositions] must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993,

8 L.Ed.2d 176 (1962)). The party moving for summary judgment bears the initial burden of showing that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden of production, the nonmoving party then must go beyond the pleadings and by affidavits, or by "depositions, answers to interrogatories and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Thus, the nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. *Matsushita, supra* at 586. It must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ "Courts may resolve fair use determinations at the summary judgment stage." *Amsinck v. Columbia Pictures Industries, Inc.*, 862 F.Supp. 1044, 1046 (S.D.N.Y.1994). However, due to the fact-driven nature of a fair use determination, "the district court should be cautious in granting a Rule 56 motion in this area ..." *Id.*

### B. Fair Use Under the Copyright Act.

#### 1. *Factors*

Congress grants exclusive rights to an owner of a copyright to reproduce copies, prepare derivative works, and distribute copies of the copyrighted work. 17 U.S.C. § 106(1), (2), and (3). Under Section 106(5), an owner has exclusive rights to display the copyrighted work publicly. 17 U.S.C. § 106(5).

Limitations on exclusive rights granted to owners are delineated in 17 U.S.C. § 107, which provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for pur-

---

**2.** Upon review of the pertinent part of the movie, Plaintiff's art work entitled, "A Place of Cross-

ing," is not clearly shown.

poses such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107.[3]

█ In order to successfully assert a claim of copyright infringement, Plaintiff must establish: (1) ownership of a valid copyright and (2) copying of the protected work by the alleged infringer. *Amsinck*, 862 F.Supp. at 1047. The Plaintiff's ownership of the copyrighted reproductions of the two paintings is not in dispute. Plaintiff's attorney, Constance Ross, submitted an affidavit indicating that she is solely responsible for registering Plaintiff's copyrights. "Following the Path" was copyrighted in 1991. (Ross Aff. at 2.) It is also not in dispute that Defendant copied Plaintiff's work in its movie. The issue is whether Defendant's use of the lithographs in the manner in which they are displayed in the movie constitutes a fair use. It is the Defendant's burden to prove that copying is justified under the fair use doctrine. *College Entrance Examination Bd. v. Pataki*,

889 F.Supp. 554 (N.D.N.Y.1995); *Rubin v. Brooks/Cole Pub. Co.*, 836 F.Supp. 909 (D.Mass.1993); *Association of American Medical Colleges v. Mikaelian*, 571 F.Supp. 144 (E.D.Pa.1983). Fair use of copyrighted material presents mixed questions of law and fact which must be determined by considering the facts of each particular case in terms of the specific, nonexclusive criteria set forth in 17 U.S.C. § 107. *See, Haberman v. Hustler Magazine, Inc.*, 626 F.Supp. 201 (D.Mass.1986).

### 2. *Purpose and Character of the Use*

█ Plaintiff argues strongly against the manner in which his paintings were used in Defendant's film, particularly because his works "depict the traditional African rites of passage from childhood to adulthood for young females and young males." (Pl.'s Mot. at 2.) Plaintiff makes it clear that he does not support the exploitation of the African-American culture and believes that the movie, *Made in America*, does just that. Defendant's movie is of a commercial nature. The United States Supreme Court in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) noted, "the fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use." *Id.* at 585. This Court must also keep in mind when viewing the first prong of the fair use doctrine that, "because nearly all authors hope to make a profit with their work, courts should be wary of placing too much emphasis on the commercial nature in a fair use determination." *Robinson v. Random House, Inc.*, 877 F.Supp. 830, 840 (S.D.N.Y.1995).

In support of its fair use argument, Defendant relies upon *Amsinck, supra* and *Ringgold v. Black Entertainment Television, Inc.*, No. 96 Civ. 0290(JSM), 1996 WL 535547, 40

**3.** The Court notes that neither party addresses the issue of whether the reproduction of Plaintiff's work is for the purpose of "criticism, comment, news reporting, teaching, ... scholarship, or research." 17 U.S.C. § 107. Neither *Amsinck, supra* nor *Ringgold v. Black Entertainment, Inc.*, 1996 WL 535547, 40 U.S.P.Q.2d 1299, No. 96 Civ. 0290(JSM) (S.D.N.Y. Sept.19, 1996) address the issue. The Court assumes that the use

falls under criticism or comment as "parody" given that the main character, Sarah, is depicted as an Afro-centric person and her house is adorned with African American and African artifacts, such as Plaintiff's art work, to enhance that image which is then juxtaposed against the image of a white, automobile salesman in cowboy boots and hat.

U.S.P.Q.2d 1299 (S.D.N.Y. Sept.19, 1996). In *Amsinck*, plaintiff, a graphic artist, created the "Baby Bears Art work" which contains a design of pastel colored teddy bears. The design was licensed for use on a musical mobile which usually is suspended over a baby's crib. Defendant Columbia Pictures released a film about a family that wanted to adopt a child. The mobile could be seen for a total of one minute and thirty-six seconds in a bedroom nursery. Plaintiff alleged in an action against Defendant that the use of the mobile constituted copyright infringement. In addressing the first prong of the four part test, the court held that the "critical issue here is not whether the sole motive of the defendant is monetary gain, but 'whether the user stands to profit form its exploitation of the copyrighted material without paying the customary price.'" *Amsinck*, 862 F.Supp. at 1049. Analyzing this test the court opined:

> Here Amsinck correctly points out that the defendants' use is for no purpose other than adding to the production of a film made for commercial purposes. However, the copyrighted work was not used in advertisements or made known to a prospective viewers. Nor does it seem that the reproduction of Amsinck's art work was intended to increase sales and thus improperly capitalize upon her work ...

*Id.* at 1049.

In *Ringgold*, plaintiff brought a copyright infringement action against defendant Black Entertainment Television for its use of plaintiff's copyrighted art work entitled "Church Picnic", which was hung as part of the background set of a television show called *ROC.* The court analyzed the purpose and character prong of the fair use doctrine in the following manner:

> The commercial nature of the television program which tends to weigh against a finding of fair use, is undercut by the fact that the defendant's [sic] did not use the Poster to encourage viewers to watch the Episode or otherwise promote the sale of the Episode [of *ROC*]. Nor is there anything about defendants' use of the Poster which indicates that they were trying to exploit Ringgold's work. (cites omitted) The Poster was used as a small part of the set to help portray an African–American church and the brief nature of defendant's use of the Poster bolsters the conclusion that its presence was incidental to the scene. . . .

*Ringgold*, 1996 WL 535547 at *3.

In the instant case, Plaintiff's works were displayed as a part of the set used for the living room of Whoopi Goldberg's character, Sarah. Plaintiff's paintings, along with other African and African American art pieces, decorated Sarah's entire home, which complemented Sarah's persona as an African American woman, very proud of her African ancestry. However, Plaintiff's paintings never became the focus of the movie. In fact, Plaintiff's works were never clearly in focus while in view. Plaintiff's works were also not used in promotional materials for the advertisement of *Made if America*. Defendant's movie, although clearly a commercial project, never used Plaintiff's works as a catalyst to increase sales for the movie. Defendant's use of the Plaintiff's paintings in the movie cannot be said to have exploited his work. More importantly, Defendant did not stand to profit from the use of Plaintiff's paintings without paying the customary price.

It must be noted that Plaintiff's painting, "Following the Path," while only in view for a few seconds in the movie, it was physically used in the movie. Sarah and Hal, during the extensive kissing scene, bumped the painting, which made it fall slightly sideways on the wall. However, it does not appear that the use of Plaintiff's painting had any measurable effect on the profitability of the movie.

Plaintiff's art work is indeed creative and original. However, it cannot be said that Defendant's movie seeks to serve as a substitute for Plaintiff's art work. The court in *Amsinck, supra,* addressing whether the use of plaintiff's mobile in a film constituted a copy stated:

> [T]he defendants' display of the Mobile bearing Amsinck's work is different in nature from her copyrighted design. In this matter, the defendants' use was not meant to supplant demand for Amsinck's work; nor does the film have the effect of diminishing interest in Amsinck's work. Defen-

dants' use was not a mechanical copy. Defendants' use, which appears only seconds at a time, can be seen only in viewing a film, is fleeting and impermanent. This Court therefore concludes that the defendants' use is not a copy for the purposes of a copyright infringement action.

*Id.,* 862 F.Supp. at 1048.

Although the issue of whether Plaintiff's work was a copy is not in dispute, this analysis is significant in that it addresses the effect of the use of Plaintiff's work in Defendant's film, which it deemed insignificant. The use of Plaintiff's art work by Defendant, although commercial in nature, does not defeat a finding of fair use for the purpose of a summary judgment motion. The first factor favors Defendant.

### 3. *The Nature of the Copyrighted Work*

█ Plaintiff alleges that his work is only licensed for use in limited markets "which represent [ ] the ideals which he embraces and exemplifies." Plaintiff's art work is mostly of African–American subjects which serve to promote and express "Afrocentric ideals and principles." (Ross Aff. at 2.) To that end, Plaintiff argues that, even if he had been asked permission by Defendant to use his art work in *Made in America,* he would have declined the offer, as he characterized Defendant's work as "culturally exploitive." (Pl.'s Br. at 8.) Plaintiff explains:

> Plaintiff's refusal to license either 'Following the Path' and/or 'A Place of Crossing' for culturally exploitive purposes and his insistence that their only authorized use be in keeping with the ideals which they depict, has established Plaintiff as an African–American artist committed to ideals and principals [sic] of Afro-centricity....

(Pl.'s Br. at 8.) "There is no dispute that the Art is creative, imaginative and original and, therefore, this factor weighs in favor of the plaintiff." *Ringgold,* 1996 WL 535547 at *4. In the instant action, the second prong should weigh in favor of Plaintiff.

### 4. *Amount and Substantiality*

█ Defendant contends, in furtherance of its summary judgment motion, that the use of Plaintiff's art work in *Made in America*

was de minimis. "In situations where the copyright owner suffers no demonstrable harm from the use of the work, fair use overlaps with the legal doctrine of de minimis, requiring a finding of no liability for infringement." *Amsinck,* 862 F.Supp. at 1049. (citing, *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 452, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)). "[T]he less adverse the effect that the alleged infringing has on a copyright owner's expectations of financial gain, the less public benefit need be shown to justify the use." *Amsinck* at 1049. In this regard, Plaintiff, in the instant action, expresses more of a personal affront to the manner in which his art work was used. He has not presented facts to show that there were any adverse actions taken against his work because of the use of the paintings in the film.

In *Amsinck,* where plaintiff's work was displayed for 96 seconds, the Court "decline[d] to find that defendants' short-term display of the Mobile in a film preclude[d] a finding of fair use." Similarly, Defendant's display of Plaintiff's art work for less than a total of 60 seconds supports Defendant's assertion of the fair use defense. The third prong, therefore, weighs in favor of Defendant.

### 5. *Effect of the Use Upon the Potential Market*

Plaintiff suggests that the Court should analyze the fourth factor of the fair use doctrine on the market as defined by Plaintiff, and "not the culturally exploitive market defined by Defendant." (Pl.'s Br. at 7.) To that end, Plaintiff argues that a genuine issue of fact exists as to the impact *Made in America* had on the market for Plaintiff to sell his copyrighted works.

The United States Supreme Court in *Campbell, supra,* requires that in analyzing the fourth prong:

> [C]ourts [must] consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially

adverse impact on the potential market' for the original. (cites omitted) The enquiry 'must take into account not only harm to the original but also of harm to the market for derivative works.'

*Id.,* 510 U.S. at 590.

In *Campbell,* holders of a copyright sued rap group "2 Live Crew" for its parody of singer of Roy Orbison's "Pretty Woman," a song written in 1964. Analyzing the facts of *Campbell* under the fourth prong standard, the Supreme Court held that the parody's commercial character is only one element to be weighed in a fair use inquiry. Speaking to parodies in general, the Supreme Court opined:

> We do not, of course, suggest that a parody may not harm the market at all, but when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act .... [T]he role of the courts is to distinguish between '[b]iting criticism [that merely] suppresses demand [and] copyright infringement [which] usurps it.' (cite omitted)

510 U.S. at 591–592.

Despite Plaintiff's contention that *Made in America* exploits African–Americans, an alternative view is that it exploits stereotypes of both blacks and whites. Even if Plaintiff's works were displayed conspicuously in several scenes throughout the movie, which they are not, profitability or popularity of Plaintiff's work would unlikely be affected just because of the use of the paintings in Defendant's film. Plaintiff has not asserted a harm cognizable under the Copyright Act. The movie is intended to be a light-hearted comedy. Matters of race relations, interracial dating, and artificial insemination, while the focus of the film, are treated in a comedic fashion. However, the nature of these topics is not and cannot be viewed humorously by many segments of our population. Plaintiff's interpretation of the film as culturally exploitive is not without merit.

Because the burden is on the Defendant to prove fair use, it is incumbent upon Defendant to present favorable evidence regarding relevant markets. *Campbell,* 510 U.S. at 590. In the instant action, Defendant maintains that there is no evidence to suggest that the licensing and sale of Plaintiff's art work after the release of *Made in America* was affected. Defendant goes further to suggest that Plaintiff may have even experienced an increase in sales as a result of Defendant's use of Plaintiff's art work in the movie. *Campbell* noted that favorable evidence without more is no guarantee of fairness. *Id.,* at 591, note 21. The Supreme Court cited an example given by a district judge of a film producer's appropriation of a composer's previously unknown song that turns the song into a commercial success. "[T]he boon to the song does not make the film's simple copying fair." *Id.*

Although Defendant has not met its burden of proof regarding the effect of the use upon the potential market under *Campbell,* the Court finds that *Campbell* is not on point. The *Campbell* case involves an analysis of a copyright work where there was evidence of substantial harm on a derivative market. The Supreme Court found no difference between the market for derivative uses and the original market of the copyrighted work. *Campbell,* 510 U.S. at 593.

■ The applicable inquiry is found in *Amsinck, supra.* Under the fourth factor, *Amsinck* enunciated the following factors: 1) whether the use tends to interfere with sales of the copyrighted article; 2) whether the challenged use adversely affects the potential market for the copyrighted work; 3) whether the "copying" can be used as a substitute for plaintiff's original work; and, 4) whether the copyright owner suffers demonstrable harm. 862 F.Supp. at 1048, 1049.

■ Here, there has been no showing that Plaintiff suffered demonstrable harm from Defendant's use of his works. Defendant's use of Plaintiff's works has not interfered with sales of the copyrighted articles. The challenged use in the movie has not adversely affected the potential market of Plaintiff's works. The "copying" of Plaintiff's works is not used as a substitute for Plaintiff's original work. The "copying" of Plaintiff's works was only used as props in the movie. The movie is not a substitute for Plaintiff's work. Plaintiff has suffered no demonstrable harm.

Although Plaintiff's attorney stated in her affidavit that she and Plaintiff "were contacted by people familiar with his work and his Afro-centric beliefs, each of whom expressed surprise at Plaintiff's authorization of the use of these two (2) particular works of art in question in a film of the nature and caliber of *Made in America*, no evidence has been submitted to show that Defendant's use harmed the sale of Plaintiff's works." (Ross Aff. at 3). The fourth prong favors Defendant.

## III. *CONCLUSION*

It is important to note that the factors used to determine whether a defendant's use of a plaintiff's copyrighted work is a fair use are non-exclusive. *Robinson,* 877 F.Supp. at 840. The overall inquiry for analyzing the fair use doctrine is whether a reasonable author would consent to the use. *Id.* Plaintiff adamantly maintains that he would not have consented to the use of his art work in the film. Plaintiff has expressed a strong desire to promote his work in a manner which he feels is in keeping with his views. The Court understands and appreciates that desire. However, the Court is required to analyze the factors established by the statute, 17 U.S.C. § 107, objectively and not subjectively. The factors the Court must consider in examining the fair use doctrine weigh in favor of Defendant. The Court finds summary judgment must be granted in favor of Defendant.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment, filed February 14, 1997 (Docket No. 10), is GRANTED.

**IT IS FURTHER ORDERED** that this action is DISMISSED.